UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLINE UTILITIES, LLC,<br><br>                      Plaintiff,<br><br>v.<br><br>DANIEL J. SCHREIBER, SCHREIBER LIVING TRUST DTD 02/08/1995,<br>                      Defendants. | Case No.: 20-CV-0670-CAB-WVG<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>[Doc. No. 11] |

This matter is before the Court on Defendants' motion to dismiss claim one of Plaintiff's amended complaint for failure to state a claim and for the Court to decline supplemental jurisdiction over the remaining state law claims. Upon consideration of the pleadings and the motion, the motion is granted.

**I.    Allegations in the First Amended Complaint**

According to the operative first amended complaint ("FAC"), Innerline Engineering, Inc. ("Innerline"), which is not a party to this case, contracted with Pacific Gas & Electric (the "PG&E Contract") "to provide certain utility line inspection services." [Doc. No. 7 at ¶ 1.] Innerline had a profit participation note in favor of Inner Assets, LLC, another non-

party, pursuant to which Innerline agreed to pay 50% of the profits from the PG&E Contract to Inner Assets. [*Id.* at ¶ 12.]

Defendant Schreiber Living Trust DTD 02/08/1995 (the "Trust") owns a 50% interest in Inner Assets. [*Id.*] Defendant Daniel J. Schreiber allegedly promised Plaintiff Inline Utilities, Inc., that in exchange for a payment of $700,000, Plaintiff "would receive . . . 18% of the revenue stream Schreiber received from the revenue stream generated by the first work crew of the PG&E Contract, and that Plaintiff would begin to receive these payments during the 2019 calendar year." [*Id.* at ¶ 15.] The FAC is silent as to who would make this payment to Plaintiff. According to the FAC, "Defendant Schreiber represented to Plaintiff…that Defendant was in the process of soliciting investments of approximately two million dollars in funding related to the PG&E Contract" and "had already raised funding from other sources." [*Id.* at ¶¶ 16, 28.]

"Based on Defendant Schreiber's representations and assurances regarding the validity of the promised investment, Plaintiff, at Defendant Schreiber's direction, wired a portion of its $700,000 payment to the Schreiber Trust account and a portion to Defendant Schreiber's attorney's trust account. . ." in July 2019. [*Id.* at ¶ 14.] Nevertheless, to date Schreiber "has failed to make any distribution and/or payment to Plaintiff nor to advise status [sic] of Plaintiff's promised investment." [*Id.* at ¶ 19.] Defendants also ignored Plaintiff's request for return of its $700,000 payment. [*Id.*] As a result, Plaintiff filed this lawsuit.

Plaintiff filed its original complaint on April 7, 2020. [Doc. No. 1.] That complaint asserted one claim under Section 10(b) for the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, and four state common law claims. In response, Defendants moved to dismiss the Exchange Act claim on the grounds that Plaintiff's investment in Defendants does not qualify as a "security" as required for the Exchange Act to apply, and asked the Court to decline supplemental jurisdiction over the remaining state law claims. Plaintiff responded with the FAC, which added the allegations, referenced *supra*, concerning Defendants' alleged efforts to raise funding from other investors.

Defendants dispute that these additional allegations remedy the deficiencies in the original complaint and have filed a similar motion to dismiss the FAC. The motion is fully briefed, and the Court deems it suitable for submission without oral argument.

## II. Discussion

### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

Fraud claims, such as Plaintiff's first cause of action, are subject to a heightened pleading standard that requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v., Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). However, Plaintiff has failed to establish that its fraud claim is governed by the Exchange Act, the Court does not need to evaluate whether Plaintiff has met the heightened pleading standard.

### B. Violation of the Exchange Act and Rule 10b-5

Section 10(b) of the Act and the corresponding regulation makes it unlawful for anyone:

> by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> *in connection with the purchase or sale of any security.*

17 C.F.R. § 240.10b-5 (*emphasis* added). Defendants argue that Plaintiff has failed to allege facts sufficient to establish that Plaintiff's arrangement with Defendants involved a security, and that therefore any fraud in connection with that investment is not enforceable as a violation of the Exchange Act. The Court agrees.

"The Exchange Act was adopted to restore investors' confidence in the financial markets, and the term 'security' was meant to include 'the many types of instruments that in our commercial world fall within the *ordinary concept* of a security.'" *Marine Bank v. Weaver*, 455 U.S. 551, 555 (1982) (*emphasis* added). That being said, although the definition of security "is quite broad",[1] "Congress . . . did not intend to provide a broad federal remedy for all fraud." *Id.* at 556. The test for whether something is a security "is

---

[1] According to 15 U.S.C. § 78c(a)(10):

> When used in this chapter, unless the context otherwise requires--
>
> (10) The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C.A. § 78c (West)

what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Id.* (*citing SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 211 (1967)) (internal quotation marks omitted). "Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Id.* at 561 n. 11.

Plaintiff argues that its payment of $700,000 in exchange for a portion of Defendants' share of Inner Assets' revenue from the PG&E Contract constitutes a security governed by the Exchange Act because it was an "investment contract." For this argument, Plaintiff relies on the Supreme Court's definition of "investment contract", as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). The court is not persuaded.

First, the FAC does not even allege the existence of a contract. Presumably, if a contract existed, Plaintiff would have brought a breach of contract claim as well. Indeed, the FAC lacks any allegations of any written documentation whatsoever of the arrangement allegedly made between Plaintiff and Defendants. In other words, the FAC does not even allege facts sufficient to demonstrate the existence of an "instrument," let alone sufficient facts sufficient to allow characterization of that instrument as a security. *See Marine Bank*, 455 U.S. at 556 (holding that the test of whether something is a security "is what character the *instrument* is given in commerce") (*emphasis* added); *see also* 15 U.S.C. § 78c(a)(10) (including "any *instrument* commonly known as a 'security'" in the definition of security) (*emphasis* added). Rather, the FAC appears only to enforce a personal obligation of Schreiber, either individually or through his Trust, to pay Plaintiff based on the Trust's receipt of revenue from Inner Assets based on Inner Assets' rights to a portion of Innerline's profits under the PG&E Contract.

Second, based on the vague allegations about Plaintiff's arrangement with Defendants, it does not appear that Plaintiff invested any money in an enterprise, common or otherwise. While Plaintiff may have invested in Defendants, Defendants' profits seemingly were not dependent upon Plaintiff's investment. Furthermore, Plaintiff does not allege that Defendants actively invested in Inner Assets' profit-sharing contract–the Trust merely owned a 50% interest of Inner Assets. Defendants' connection to the profit-sharing contract was only through partial ownership of a string of third-party investments. Plaintiff simply gave money to Defendants and, in return, Defendants allegedly agreed to pay Plaintiff a fixed percentage of their share of Inner Assets' share of Innerline's profits from the PG&E contract–Plaintiff acted more like a lender than an investor. Thus, Plaintiff was several steps removed from an investment in any actual contract or enterprise.

Finally, regardless of whether Plaintiff's deal with Defendants constituted an investment in an enterprise, the allegations in the FAC of the context of the deal demonstrate that it does not "fall within the *ordinary concept* of a security." *Marine Bank*, 455 U.S. at 556. As the Supreme Court noted in *Marine Bank*, "the broad statutory definition [of security] is preceded . . . by the statement that the terms mentioned are not to be considered securities if 'the context otherwise requires.'" *Id*. Among the contextual factors that led to the Court's holding that the agreement was not a security were that: (1) no prospectus was distributed to the Weavers or other potential investors; and (2) the investment "was not designed to be traded publicly." *Id.* at 560. Both of these factors are present here.

Other allegations (or the lack thereof) "underscore[] the unique character of the transaction" between Plaintiff and Defendants. *Id.* Unlike *Howey*, there are no allegations that Plaintiff accepted an offer made to members of the public at uniform terms. *See Howey*, 328 U.S. at 295, 299. Although the FAC alleges that Schreiber, to further induce Plaintiff to invest, stated that he was in the process of soliciting other investments in the PG&E Contract and "had already raised funding from other sources" [Doc. No. 7, at ¶ 16],

it does not allege that the same investment terms were offered to anyone who wanted to invest.

Further, the apparent lack of written documentation for Plaintiff's deal with Defendants indicates that whatever investment Plaintiff made with Defendants was not intended to be publicly traded. *See Marine Bank*, 455 U.S. at 560 (noting that "a security is an instrument in which there is common trading") (citation omitted). As stated above, it is unclear what sort of instrument was created here, assuming one was created at all. Plaintiff's alleged entitlement to profits from the PG&E Contract is alleged to be based solely on (presumably oral) representations made by Schreiber. Plaintiff cites to no authority that a right to payment derived solely from an oral promise by an individual could fall within the definition of "security" and the Court is unaware of any such authority. Ultimately, the only plausible inference from the allegations in the FAC is that Plaintiff's deal with Schreiber was the sort of "single unique agreement, 'negotiated one-on-one' between two parties, that is not ordinarily considered to be a security and that was never designed to be publicly traded, [and therefore] is not a security under the Act." *Mace Neufeld Prods., Inc. v. Orion Pictures Corp.*, 860 F.2d 944, 946 (9th Cir. 1988). Accordingly, because the FAC does not allege facts sufficient to demonstrate that Plaintiff's deal with Defendants involved a security, Plaintiff does not have a claim under the Exchange Act based on Defendants' alleged misrepresentations related to that deal.

### C. Supplemental Jurisdiction Over Remaining Claims

Defendants also move to dismiss the remaining state common law claims under Rule 12(b)(1) for lack of subject matter jurisdiction. Because these claims were granted supplemental jurisdiction under 28 U.S.C. § 1367, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Because the federal law claim has been dismissed, the remaining claims are dismissed as well.

### III. Disposition

For the foregoing reasons, it is hereby **ORDERED** that Defendants' motion to dismiss all five of Plaintiff's claims is **GRANTED**.

It is **SO ORDERED**.

Dated: August 4, 2020

Hon. Cathy Ann Bencivengo
United States District Judge